IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS G. WERNER, | ) | Case No. 11 C 50213 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

I.      **Introduction**

Thomas G. Werner ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny his claim for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before

the Magistrate Judge pursuant to the consent of both parties. *See* 28 U.S.C. § 636(c); Fed. R. Civ.

P. 73.

II.      **Administrative Proceedings**

Claimant alleges that he was disabled as of September 27, 2008 after sustaining several

injuries in an automobile accident. On November 13, 2008, Claimant applied for DIB. (Tr. 124-

130.) This DIB application was denied initially and again upon reconsideration. (Tr. 74, 80.)

Claimant then filed a timely request for a hearing before an Administrative Law Judge ("ALJ").

(Tr. 43-71.) His request was granted and the hearing took place before ALJ Daniel Dadabo via

video teleconference between Evanston and Rockford, Illinois on August 31, 2010. (Tr. 43.) Claimant appeared and testified in Rockford for the hearing with his attorney present. (Tr. 43, 47.) Vocational expert ("VE"), Susan Entenberg, also testified before the ALJ. (Tr. 43, 62.)

After the hearing, the ALJ found that Claimant was not disabled and therefore denied his claims for DIB. (Tr. 12-29.) In response, Claimant filed a request for review with the Social Security Administration. (Tr. 1-3.) The Appeals Council denied Claimant's request. (Tr. 1-3.) As a result of this denial, the ALJ's decision is considered the final determination of the Commissioner. *See* 20 C.F.R. §§ 404.981, 404.981, 416.1455, 416.1481. Claimant now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

III.    **Background and Hearing Evidence**

Claimant believes that he is disabled due to physical injuries sustained in a DUI-related automobile accident in 2008. (Tr. 255, 271-272, 275.) Claimant was not wearing a safety belt, fell asleep while driving, and was ejected from the car. (Tr. 271-272, 275.) As a result, Claimant suffered cervical, thoracic spine, rib, sternum, nose, and facial fractures. (Tr. 268-269, 272, 276-277.) In addition, he claims that he suffers chronic depression, dizziness, and memory deficiencies stemming from the accident, alleging that those symptoms are disabling as well. (Tr. 46.)

Claimant was fifty-five years old at the time of the hearing. (Tr. 47.) He was educated and completed high school, attended a few semesters of college, but dropped out and never earned a degree. (Tr. 47.) Claimant stands five feet and eight inches tall; he weighed approximately two-hundred and fifteen pounds at the time of the hearing. (Tr. 152, 1123.)

Claimant's work history consists of construction work, boat sales, restaurant and bar management, and ownership and sales management of a printing and publishing company. (Tr. 174.) He has not been gainfully employed since his injuries. (Tr. 174.)

At the hearing, the ALJ first questioned Claimant's ability to drive. (Tr. 47.) Claimant admitted that he often drives approximately twenty-five miles "most every day." (Tr. 47.) Although he said that sometimes his narcotic medication, hydrocodone, or his back pain can limit his driving, in February 2010 Claimant drove from Illinois to Florida in order to visit his daughter. (Tr. 47,49.) The trip took him two and a half days to complete, but that timeframe includes the day Claimant visited his sister in Alabama. (Tr. 48.) Claimant was also able to tolerate a five-hour flight to Mexico for vacation in January 2010. (Tr. 49.)

When asked to describe his pain, Claimant stated that his back pain is localized in his mid-to-upper back. (Tr. 49.) It mostly affects him in the morning when he first wakes up. (Tr. 49.) The pain will lessen as the Claimant gets moving around. (Tr. 49.) Yet, sometimes it will flare up after certain activities: standing, lifting, and mowing. (Tr. 50.) "[D]uring the day it'll go from excruciating pain to tolerable pain and then back to excruciating pain towards the evening," he testified. (Tr. 50.) The ALJ asked Claimant to assign a number rating from one to ten - ten being the most extreme - to describe his daily pain, (Tr. 50.) Claimant said his pain is a "four" when he wakes up in the morning. (Tr. 50.) "If I don't . . . take it easy, it might go up to a five or six," he said. (Tr. 51.) "[I]f I do the wrong thing, then it shoots up to a seven or eight." (Tr. 51.) When his pain increases to these higher levels, Claimant will take hydrocodone, a narcotic pain medication. (Tr. 51.) On average, he takes one hydrocodone per day, "otherwise [he] can tolerate [the pain] with   . . . Advil" or Aleve, taking up to eight of these over-the-counter pills every day. (Tr. 51, 56.)

As far as his physical limitations are concerned, Claimant asserted that he is able to stand in one position for fifteen minutes at a time and sit for an hour without needing to get up and walk around. (Tr. 51.) "Standing is worse than sitting," he said. (Tr. 51.) "[I]f I get sore from standing, then I have to sit in a chair and put my feet up to [feel] normal." (Tr. 51-52.) He testified that he will often recline with his legs elevated for about two-to-three hours on an average day. (Tr. 58.) Also, Claimant acknowledged that he "can lift quite a bit" if he lifts objects to his side: "I can handle like [twenty-five], [thirty] pounds pretty easy. However[,] if I've got anything out in front of me, [it] just kills me." (Tr. 52.)

At the time of the hearing, Claimant still attended physical therapy every Friday. (Tr. 53.) Claimant said that he had been going to therapy for approximately one year. (Tr. 53.) Although Claimant thought the sessions were helpful, he still experienced pain. (Tr. 53, 57.)

The ALJ asked Claimant if he could perform "a sitting job" to "take advantage of [the] past work [that he has] done." (Tr. 54.) Claimant answered that the biggest obstacle to his performance would be his dizziness and general lack of concentration due to his pain: "[W]hen I get a dizzy spell, I just can't concentrate and . . . I don't remember well. So I don't think I [could perform] a sitting job that requires that type of thing," he said. (Tr. 54.) Claimant later admitted that he did not have any problems concentrating on "simple things" like television programs, but he elaborated that he sometimes finds himself not paying attention while in conversation. (Tr. 60.)

Later, during his attorney's examination, Claimant stated that his daily dose of hydrocodone made him feel dizzy and groggy. (Tr. 57.) However, he thought the effect was in addition to, rather than the cause of, his underlying confusion and dizziness. (Tr. 57.) Claimant

testified that the dizziness, fatigue, and pain causes him to cease all activity once every two weeks on average. (Tr. 61-62.) He also gets sore and tired, and reported trouble sleeping at night. (Tr. 57.)

Just as Claimants examination was coming to a close, his attorney brought up the topic of depression, seemingly as an afterthought. (Tr. 62.) Claimant stated that he experienced "a lot of depression" four years prior to the hearing, after his divorce. (Tr. 62.) Since then, he had been taking Lexapro but ceased the medication because he felt that he was already taking too many pills for his pain. (Tr. 62.) "I think I still have some depression[,] but not like . . .after the divorce," Claimant explained. (Tr. 62.) He thought the depression was under better control at present; "[a] little bit of depression, but it's better [now]," he affirmed. (Tr. 62.)

After Claimant's examination concluded, the VE was called to testify. (Tr. 60.) Initially, she had a question regarding the nature of Claimant's past work as a sales manager at a printing plant. (Tr. 60-64.) The ALJ gave Claimant an opportunity to describe his duties required for that position. (Tr. 64.)  He explained that he would usually sit down for about six hours while on the job, but that he needed to drive to other printing facilities about once a week. (Tr. 64.) After considering Claimant's explanation, the VE classified the managing position as "sedentary" and "skilled." (Tr. 66.)

Next, the ALJ asked the VE to consider the transferability of an individual of Claimant's age, with his level of education and work experience, who could perform sedentary work. (Tr. 66-67.) The VE testified that such a person could perform Claimant's past relevant work as a salesman and his skills of "sales and management of people" were transferable to 50,000 other skilled and semi-skilled positions in the Chicago metropolitan area alone. (Tr. 67.)

## IV.   **Medical History**

The first medical record available is from the early morning of September 27, 2008, when Claimant was involved in an automobile accident. (Tr. 244.) Claimant was taken to the Mercy Medical Center ("MMC") in Dubuque, Iowa after he was driving a convertible and "supposedly fell asleep." (Tr. 244.) He was not wearing a safety belt during the accident and he was ejected from the car as the vehicle rolled over. (Tr. 244, 271-275.) Claimant "laid in the field for [an] unknown amount of time" before paramedics found him and brought him to MMC's trauma center. (Tr. 244.) At the time of his arrival, he was awake, alert, and oriented, but doctors reported his blood alcohol level as 0.13. (Tr. 244.) The initial diagnosis included "head injury, fractures of the [cervical] spine, chest, [and] abdominal trauma." (Tr. 244.)  Dr. Joseph Fuller, M.D., reviewed Claimant's computed tomography ("CT") scan and reported no obvious intracranial injury, but a large hematoma outside the skull, bilaterally collapsed lungs, and an unstable C-6 fracture. (Tr. 246, 255.) Dr. Michael Riley, M.D., subsequently found an unstable T-8 burst fracture, a T-5 compression fracture, a T-9 transverse process fracture, sternal fracture, along with multiple rib and facial fractures. (Tr. 256.)

By 7:47 AM that morning, Claimant was transferred to the University of Wisconsin Hospital ("UWH") in Madison, Wisconsin for additional treatment. (Tr. 267.) Upon his arrival, doctors there recommended "conservative management" of ice packs and "pain control" for the time being. (Tr. 278.) That afternoon, it was reported that Claimant would "likely need operative intervention in the next week to repair his nasal bone fracture, and possible control of his left [jaw]." (Tr. 278.) Similarly, on the following day, doctors determined that they would indeed

attempt "nonoperative treatment" for Claimant's injuries, with the exception of surgery to repair his nasal fracture and the insertion of chest tubes. (Tr. 285, 294, 297.) Claimant was closely monitored for any changes in his condition for several weeks.

On October 9, 2008, Claimant's cognitive, memory, and linguistic skills were assessed while he was still under the care of UWH. (Tr. 431.) His results were found to be in the low-average range and a "deficit was measured in the area of delayed memory." (Tr. 431.) However, Claimant did not have access to his reading glasses and the assessor noted that this "may have negatively impacted the score." (Tr. 431.)

Later that day, Dr. Michael J. Ward, M.D., summarized that "[t]he patient underwent [surgery] . . . for his posterior septum fracture" and that "[t]he [additional] fractures were otherwise treated conservatively and nonoperatively using a [cervicothoracolumbar spine orthotic ('CTLSO')] brace." (Tr. 443.) Further, he opined that Claimant's cognition was unaffected by his accident. (Tr. 444.) In the meantime, Claimant continued to progress with the addition of physical therapy during his stay. (Tr. 433.) Claimant was not discharged from UWH until October 13, 2008. (Tr. 269.)

On the day of his discharge, Claimant checked in to the Finley Hospital Acute Rehabilitation Unit ("Finley") in Dubuque, Iowa to begin inpatient physical therapy. (Tr. 1045.) Dr. Mark W. Fortson, M.D., noted that the "goal of therapy will [be] re-establishment of adequate strength and coordination to be independent in [Claimant's] activities of daily living while allowing his fractures to heal to the point of restoration of spinal column stability." (Tr. 1046.) "Physical therapy and occupational therapy will be the key in the patient's recovery efforts," he added. (Tr. 1046.) Claimant's history of hypertension, depression, and alcohol

dependence was reviewed. (Tr. 1046.) Dr. Fortson anticipated that Claimant would continue to be hospitalized for inpatient rehabilitation until the end of November. He remained in physical therapy after his release and throughout the rest of the fall of 2008. (Tr. 1043-1090.)

On December 18, 2008, just a few months after his accident, Claimant was evaluated by Dr. Clifford Tribus, M.D., at the University of Wisconsin Department of Orthopedics and Rehabilitation Medicine. (Tr. 1099.) Dr. Tribus discussed Claimant's prior MRI results, noting "retropulsion and some slightly increased edema at [T-8]; however, since his clinical exam he had improved somewhat, we [will] continue treating him nonoperatively." (Tr. 1098.) Claimant believed that his gait and balance had improved and that he had no problems with fine motor skills at the time. (Tr. 1098.) Dr. Tribus instructed that Claimant could "wean himself out of his cervical collar" and, within two weeks, he could begin to discontinue use of his CTLSO brace as well. (Tr. 1098.) Claimant was also advised to cut back on his pain medications. (Tr. 1098.)

Just under a month later, DDS physician, Dr. Ernst Bone, M.D., completed a Residual Functional Capacity Assessment form on January 9, 2009. (Tr. 1101.) Upon review of Claimant's medical records, Dr. Bone found that Claimant could

- occasionally lift or carry twenty pounds;

- frequently lift or carry ten pounds;

- stand and walk for about six hours in an eight-hour workday;

- sit for about six hours in an eight-hour workday;

- push and pull without restriction other than his abilities to lift and carry;

- climb stairs, ramps, ladders, and scaffolds frequently;

- and frequently stoop, kneel, crouch, and crawl. (Tr. 1101-1103.)

Dr. Bone explained, "[Claimant's] statements are partially credible when compared to the objective medical evidence. [However,] [t]his evaluation takes into account how [Claimant] will be functioning [twelve] months after [his] onset date." (Tr. 1103.) These findings were affirmed upon reconsideration by Dr. Richard Bilinsky, M.D., on May 21, 2009. (Tr. 1178-1179.) "[Claimant] will be able to sustain work activity with limitations as shown in [Dr. Bone's assessment . . . by [September 27, 2009]," he wrote. (Tr. 1179.)

Claimant entered the Midwest Medical Pain Management Clinic ("Midwest"), located in Galena, Illinois, to see Dr. Randall Busch, M.D., on February 19, 2009. (Tr. 1121.) His chief complaints consisted of dizziness, memory loss, and back pain. (Tr. 1121.) At the time, Claimant rated his pain as a "four" out of ten. (Tr. 1121.) When at its worst, he described his pain as a "nine;" at its most managable, he rated it as a "one." (Tr. 1121.) Dr. Busch reported that the pain "is worse when he stands, walks, exercises, coughs[,] or sneezes. However, if he walks[,] his legs seem to improve but his back worsens. Sitting in a [recliner] seems to be the most efficacious manipulation he can do to relieve his discomfort." (Tr. 1121.) "[H]e is frequently quite restless in his sleep and [it] is markedly disturbed," he explained. (Tr. 1121.) A history of depression was discussed but it was found to be "well-controlled." (Tr. 1122.)

"He is unemployed because of pain," Dr. Busch reported. (Tr. 122.) "He would return to work if he had no pain problem, but he feels that now he is having memory problems and this is causing him substantial difficulty." (Tr. 1123.) The topic of Social Security benefits even came up during the evaluation: Dr. Busch wrote that Claimant had "not tried to return to work" and that he "has not been awarded [disability payments] and has asked [Dr. Busch] on several occasions during our history today if [he] could assist him in this." (Tr. 1123.)

When questioned about his alcohol consumption, Claimant stated that he drank approximately five times every day to self-medicate. (Tr. 1123.) "I cannot help but think that the alcohol is further causing him memory disturbance. It may also be contributing to his dizziness," Dr. Busch wrote. (Tr. 1123.) "It is common for him to go out and socialize . . . and have a few beers and come home and drink martinis until he is either pain[-]free or asleep." (Tr. 1122.) Nonetheless, Dr. Busch referred Claimant to neurologist Dr. Marsha Horwitz, M.D. for a cognitive evaluation. (Tr. 1125.)

Claimant saw Dr. Horwitz on February 23, 2009. (Tr. 1109.) Claimant felt that physical therapy was exacerbating his pain, he did not believe that his medications were providing any relief, and that he suffered from fatigue. (Tr. 1121.) He also reported "substantial difficulty" with his memory; he had trouble remembering names and would often walk into a room and forget why. (Tr. 1123.) Additionally, Claimant also complained of dizziness, particularly when he would lower his head; the feeling was so extreme that he would often feel as though he may lose consciousness at times. (Tr. 1123.) Notably, Claimant admitted to Dr. Horwitz that his daily alcohol consumption had increased recently. (Tr. 1109.)

After Claimant's evaluation, Dr. Horwitz concluded that he "definitely ha[d] a vestibular concussion with positional vertigo" specifically accounting for his dizziness. (Tr. 1112.) As to his memory problems, they were "multifactorial, in part related to his head injury." (Tr. 1112.) "I am definitely concerned about the role of alcohol," she added. (Tr. 1112.) She advised Claimant to discontinue all alcohol consumption "since it is toxic to his system [and] maybe contributing to his memory difficulties[.]" (Tr. 1112.) She continued, "He needs to actively participate in his physical therapy, continue his number puzzles . . . in order to improve[.] I did not bring up the issue of alcohol counseling," she wrote. "That may in fact be what he needs." (Tr. 1112.)

Claimant returned to Dr. Busch the following day and he was again warned "that he needs to stop medicating and using alcohol as an analgesic." (Tr. 1120.) Claimant was prescribed Percocet, but was instructed to take the pills "for severe pain only;" otherwise, Dr. Bush directed Claimant to rely on Tylenol and Advil to address pain symptoms. (Tr. 1120.) It was explicitly stressed that Claimant not ingest alcohol while taking medication. (Tr. 1120.) Furthermore, Dr. Bush was alarmed that Claimant may have been exhibiting early signs of Wernicke's syndrome.[1] "[H]opefully we can avert any permanent damage," he wrote. (Tr. 1120.) Aside from the warnings, Claimant reported that his physical therapy was beneficial and that the "tingling" pain symptoms were resolving on their own. (Tr. 1120.)

On April 22, 2009, psychologist Dr. Julian Burn, M.D., met and evaluated Claimant at the London Psychiatric Clinic in Clinton, Iowa. (Tr. 1153.) Dr. Burn first spoke to Claimant about his personal background and medical history, including his back injury and alcohol consumption. (Tr. 1153-1155.) Claimant complained of chronic pain, but Dr. Burn wrote that he "seems to be somewhat somatic in his complaints about his general condition." (Tr. 1154.)

Claimant's memory and concentration were then tested using the Wechsler Memory Scale. His raw scores were reported as "information 5, orientation 5, mental control 4, memory passages 2, digits total 9, [v]isual reproduction 8, associate learning 8, mental quotient 81. Classification: Low-Average." (Tr. 1155.) "[H]e did fairly well in the memory exam and I do not really see obvious evidence of organic memory loss. It appears to be more a factor of

---

[1] Wernicke-Korsakoff syndrome is a brain disorder due to thiamine (vitamin B1) deficiency. Wernicke encephalopathy and Korsakoff syndrome are different conditions. Both are due to brain damage caused by a lack of vitamin B, common in people with alcoholism. Korsakoff syndrome, or Korsakoff psychosis, tends to develop as Wernicke symptoms go away. Wernicke encephalopathy causes brain damage in lower parts of the brain called the thalamus and hypothalamus. Korsakoff psychosis results from permanent damage to areas of the brain involved with memory. National Library of Medicine, A.D.A.M. Medical Encyclopedia. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001776 (last visited Oct. 19, 2013.)

concentration than it does discreet memory functions," Dr. Burn wrote. "[T]here was some evidence of concentration skills especially on digits backwards[;] he was able to do [four] digits backwards. The overall impression is there is no serious memory function deficit." (Tr. 1155.) Markedly, Dr. Burn further opined that Claimant "seems to indicate that he is adopting a sick role, maybe using these complaints for secondary gain." (Tr. 1155.)

On May 19, 2009, DDS physician Dr. Jerrold Heinrich, Ph. D, completed a Psychiatric Review Technique evaluation form after reviewing Claimant's medical history. (Tr. 1159.) Dr. Heinrich found that Claimant had a medically determinable impairment of a pain disorder associated with both "psychological factors and general medical condition" and noted "heavy alcohol use." (Tr. 1165, 1171.) In rating Claimant's functional limitations, he found:

- mild restriction of activities of daily living and maintain social functioning;

- moderate difficulties in maintaining concentration, persistence, or pace; and

- no episodes of decompensation with extended duration. (Tr. 1169.)

Next, Dr. Heinrich completed a Mental Residual Functional Capacity assessment form. (Tr. 1173.) He check-marked moderate limitations in Claimant's ability to do the following activities:

- understand and remember very short and simple instructions;

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and

- respond appropriately to changes in the work setting. (Tr. 1173-1174.)

No other limitations were marked in the remaining categories. (Tr. 1173-74.) Dr. Heinrich concluded that Claimant "can adjust to routine changes in his environment as long as they are not

too frequent," he "needs a low[-]stress job where speed . . . is not essential," and he "retains the mental and behavioral capacity to do simple tasks within the limitations noted." (Tr. 1175.)

On August 18, 2009, Claimant underwent an unrelated colonoscopy with Dr. Matthew Gullone, M.D.. (Tr. 1195.) Remarkably, during his initial consultation, Claimant stated that he sometimes took Oxycontin "every week when he gets sore[,] *usually before golf*" and drank a case of beer every week. (Tr. 1195.) (emphasis added). Three days later, on the date of his colonoscopy procedure, Claimant reported that he actually drank as much as two cases of beer every week. (Tr. 1197.)

Notwithstanding, Claimant continued physical therapy throughout late 2009 and early 2010. (Tr. 1208.) He visited a chiropractor a few times in January 2010, where he reported that his condition was consistently "better" than it was reported in his prior appointments. (Tr. 1191-1192.) Claimant's record of similarly conservative treatment extends to the date of his ALJ hearing. (Tr. 1210-1214.)


## VI.     <u>Framework of Decision</u>

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The ALJ proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment, if it exists, meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity ("RFC") and other vocational factors. *See* 20 C.F.R. § 404.1520.

## VII.   Analysis

### A.   Step One: Is the Claimant Currently Engaged in Substantive Gainful Activity?

At Step One, the ALJ determines whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). Substantial gainful activity is defined as work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. *See* 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If the ALJ finds that a claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ found that Claimant was not currently engaged in substantive gainful activity since September 27, 2008, the date of Claimant's accident. (Tr. 17.) The court affirms the ALJ's finding at Step One as it is based on substantial evidence in the medical record and the hearing testimony.

**B.      Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination of whether the claimant is suffering from a severe impairment. A severe impairment is an impairment which significantly limits the claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step-Two severity determination. *See* 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the Claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In the present case, the ALJ found that Claimant suffered the following severe impairments: "[C-6] fracture; [T-5], [T-8] burst fractures; [T-7], [T-9] vertebral body fractures; and alcohol abuse." (Tr. 17.) Substantial evidence supports the ALJ's finding. Neither party takes issue with the ALJ's Step-Two determination. Therefore, this Court affirms this finding and the analysis moves to Step Three.

**C.      Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a). The Listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends. If not, the inquiry moves on to Step Four.

Here, the ALJ ruled that Claimant does not have an impairment, or a combination of impairments, that meet or medically equal one of the listed impairments in 20 C.F.R. 404. (Tr. 19.) This finding is not contentious and the Court affirms the ALJ's Step-Three determination.

### D. Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?

At Step Four, the ALJ determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. RFC is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his or her limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the ALJ who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); S.S.R. 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

### 1. The ALJ's RFC Determination

That ALJ's RFC finding, in its entirety, states that "Claimant has the [RFC] to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (Tr. 19.) The regulations define sedentary work as

> work [that] involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers,
> and small tools. Although a sedentary job is defined as one which
> involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties. Jobs are sedentary if walking
> and standing are required occasionally and other sedentary criteria
> are met.
>
> 20 CFR 404.1567(a).
>
> "Occasionally" means occurring from very little up to one-third of
> the time. Since being on one's feet is required "occasionally" at the
> sedentary level of exertion, periods of standing or walking should
> *generally* total no more than about 2 hours of an 8-hour workday,
> and sitting should *generally* total approximately 6 hours of an 8-
> hour workday. Work processes in specific jobs will dictate how
> often and how long a person will need to be on his or her feet to
> obtain or return small articles.
>
> SSR 83-10 (emphasis added).

Upon consideration of the record evidence and testimonies of the VE and Claimant, the ALJ

determined that Claimant's prior work as a sales manager was "a skilled job of sedentary

exertion as it was actually performed" and found that, despite Claimant's limitations, he retained

the ability to perform his past relevant work. (Tr. 23.) Therefore, Claimant was found not

disabled. (Tr. 23.)

Claimant argues that this finding is erroneous as he believes that his management job

should have properly been categorized as "light work" rather than "sedentary work." Light work

is defined as

> work [that] involves lifting no more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this
> category when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls. To be considered capable of
> performing a full or wide range of light work, you must have the
> ability to do substantially all of these activities. If someone can do

light work, we determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of
fine dexterity or inability to sit for long periods of time.

20 CFR 404.1567(b).

Indeed, even the VE initially expressed confusion concerning the categorization of
Claimant's past sales management position. (Tr. 63-64.) However, following Claimant's
explanation of his duties and activities while working as a sales manager, the VE clearly stated
that the position would accurately be classified as "sedentary, skilled" as it was actually
performed. (Tr. 66.) This finding was not challenged at the hearing.

Claimant now offers an argument as to how the record evidence supports a different
finding than the ALJ's determination: he points to the Claimant's testimony describing his
management job, where he stated that he would need to drive to three other plants once a week.
(Tr. 64-66.)

Specifically, Claimant argues that on days that he was required to drive "he would be
sitting less than six hours and walking or standing more than two hours" for that one day.
However, there is no explanation provided as to how, exactly, the act of driving would require
Claimant to walk or stand for more than two hours. There was no evidence presented showing
that Claimant was required to excessively stand or walk while on these one-day trips for more
than one-third of the day. The testimony was only that Claimant was required to drive once a
week. (Tr. 63-64.) There is no evidence to support a finding that the work, as Claimant himself
described it, should be classified as anything more than sedentary, and again, the VE's
classification was not challenged at the hearing. For these reasons, the Court affirms the ALJ's
categorization of Claimant's sales management position as skilled and sedentary work.

Second, Claimant attacks the ALJ's decision, asserting that Claimant was not able to
drive on a regular basis due to the effects of his hydrocodone medication. This would prevent

Claimant from performing his past work. However, the Court is not persuaded. Hydrocodone use, in and of itself, does not require one to forego driving.[2] Although Claimant testified that he drives around twenty-five miles "almost every day unless [he is] taking the hydrocodone," his testimony is inconsistent as he also later testified that he usually took hydrocodone once a day. (Tr. 47, 56.)

No objective medical source opined that Claimant was unable to drive and it appears as though Claimant was able to transport himself to and from appointments and leisure activities without difficulty – even to go play golf. (Tr. 1195.) As far as his job requirement is concerned, Claimant testified that he was only required to drive to these other plants on one day out of the week; surely, Claimant's testimony and activity shows that he was consistently able to drive "almost every day." (Tr. 1195.) Despite Claimant's allegations of his limited ability to drive, the ALJ considered Claimant's long list of routines and activities and found that he was able to drive regularly. (Tr. 22-23.) The ALJ drew special attention to the fact that Claimant was recently able to drive for many hours to Alabama and Florida and he endured a five-hour flight to Mexico on his own without significant complications. (Tr. 22-23, 49, 197-208.) Substantial evidence supports the ALJ's finding that Claimant was able to drive on a regular basis and the ALJ built a logical bridge from the evidence and his conclusion.

Next, Claimant alleges that the ALJ erroneously rejected the findings of the SSA evaluating consultant, Dr. Heinrich, who found moderate mental limitations during his review of Claimant's medical history. (Tr. 23, 1175.) Specifically, Dr. Heinrich found moderate limitations in Claimant's ability to maintain concentration, persistence, or pace. (Tr. 1169.) In his opinion, the ALJ gave Dr. Heinrich's findings little weight, reasoning that it was inconsistent with the opinions of Dr. Burn, who, unlike Dr. Heinrich, personally met with and evaluated the Claimant:

[2] *See http://www.drugs.com/hydrocodone.html* (last visited Sep. 27, 2013.)

"the actual report of [Dr. Burn's] consultative examination upon which [Dr. Heinrich's evaluation] is based denoted merely mild mental restriction[.]" (Tr. 23.) The ALJ pointed to the following evidence found earlier in his opinion:

- Dr. Burn reported that Claimant "did fairly well" on objective memory testing and had "no serious memory function deficit." (Tr. 17, 1155)

- After Dr. Burn's evaluation, Claimant was diagnosed with pain disorder, but not a memory or cognitive disorder. (Tr. 17-18, 1155.)

- Dr. Burn assigned Claimant a GAF of 65, indicative of not more than "mild" limitations. (Tr. 18, 1155.)

Further, Dr. Horwitz reported Plaintiff's attention span and concentration were normal, his cognitive function, recent and remote memory, and his fund of knowledge were all within normal ranges. (Tr. 1110, 1130.) The Court finds that the ALJ's determination is supported by substantial evidence and declines to remand on this issue.

Finally, Claimant contends that the ALJ's RFC ignores the requirements of SSR 96-8p: "[t]he RFC assessment must include a discussion of why [Claimant's] reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p. Claimant argues that "The ALJ's decision is devoid of this requisite discussion" as Claimant needed to change positions often, could not sit or stand for extended periods,  needed to take rest or stretching breaks, and his severe pain required him to lay down or elevate his legs in a recliner.

On the contrary, the ALJ found the following:

- "[D]espite dizziness, [Claimant] continues to drive, including an extended drive to Mobile, Alabama [and Fort Walton, Florida]." (Tr. 22.)

- "[C]laimant testified that he drove to Mobile, Alabama and Fort Walton, Florida in February 2010. Therefore, the extended sitting required for a

sedentary position reasonably appears possible. The month before this trip, January 2010, [Claimant] in a like vein, flew to Ixtapa, Mexico. The foregoing suggests that pain is not so disruptive as to make [Claimant] immobile." (Tr. 22.)

- "[T]he record denotes several long trips that necessarily require greater stationary postures and mobility than [Claimant] willingly acknowledged." (Tr. 22.)

- "Though he alleges that he must recline for periods after performing tasks, he acknowledges that me makes breakfast for himself, cleans up, does laundry, dishes, light vacuuming, runs errands . . . and grocery shops twice a week[.] He acknowledges that carrying bags of groceries, a basket of laundry or taking out the trash is not a problem if [the items are] not heavy[.] . . . He testified that he drives locally on a daily basis, about [twenty to twenty-five] miles." (Tr. 22.)

- "[C]laimant has elsewhere asserted that his functional limitations consist of difficulty with the following: yard work, bending, dizziness, standing in one place for prolonged periods, overhead lifting, lifting from the floor, carrying objects in front, and trying to bend his head below heart level[.] Yet, even crediting these assertions fully, the foregoing is notably not inconsistent with sedentary work." (Tr. 22-23.)

With the analysis, the ALJ adequately addressed Claimant's ability to concentrate, sit, stand, drive, bend, lift, and his alleged need to rest and recline. (Tr. 17-18, 22-23.) More importantly, the ALJ specifically explained why he believed Claimant's allegations of limiting conditions were not entirely credible. (Tr. 22-23.) In consideration of the above, the Court finds that the ALJ's RFC determination is supported by substantial record evidence and that the ALJ built a logical bridge from his finding to that evidence. As a whole, the ALJ's RFC and Step Four determination that Claimant is capable of performing past relevant work as a sales manager is affirmed.

Despite this Step-Four determination, the ALJ made an alternative finding at Step Five that Claimant is capable of performing other occupations that exist in significant numbers in the national economy. *See* 20 CFR 404.1569 and 20 CFR 404.1568(d), (Tr. 23-24.) Although the Court has affirmed the ALJ's Step-Four finding, the Court reviews the ALJ's Step-Five determination for the sake of completeness.

    **E.      Step Five: Is Claimant is capable of performing work existing in substantial numbers in the national economy?**

At Step Five, the ALJ must establish that Claimant's RFC allows Claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The ALJ may carry this burden by relying upon the VE's testimony, or by showing that Claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. Where, as here, Claimant is of advanced age, the ALJ must also find that Claimant has transferable skills that require little vocational adjustment. *See* 20 CFR 404.1568(d)(4). Generally, if the ALJ establishes that sufficient work exists in the national economy that Claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, Claimant will be found to be disabled and the analysis is over.

Here, the VE testified that Claimant's skills, "sales and management of people," were transferable to 50,000 other skilled and semi-skilled positions in the Chicago metropolitan area alone. (Tr. 67.) The ALJ relied on the VE's undisputed testimony and therefore found that Claimant has not been under a disability and therefore was not entitled to benefits. (Tr. 24.)

Claimant argues that the ALJ failed to adequately and explicitly explain why Claimant would need to make "very little, if any, vocational adjustment to a different job" as required by the Regulations for claimants of advanced age. *See* 20 CFR 404.1568(d)(4); *Abbot v. Astrue*, 391 Fed.Appx. 554, 558 (internal citations omitted).

The Court agrees that the ALJ's analysis at this stage is meager and vague. The ALJ only wrote that Claimant "has also acquired work skills from past relevant work that are transferrable to other occupations with jobs existing in significant numbers" and briefly reviewed the VE's hearing testimony. (Tr. 24.) Evidence of specific skilled or semi-skilled jobs that exist must be included in the ALJ's findings and this evidence is noticeably absent from the ALJ's determination. *See SSR* 82-41. Despite this error, because the Court has already affirmed the ALJ's Step-Four finding above, the Court declines to remand on this issue in Step Five.

## VIII.  Conclusion

 In light of the foregoing reasons, Claimant's motion for summary judgment is denied and Commissioner's motion for summary judgment is granted.

**ENTER:**

_____
**P. Michael Mahoney, Magistrate Judge**
Dated: Oct 23, 2013          **United States District Court**